**PANHANDLE & SANTA FE RY. CO. v. KARR et al.**

No. 6273.

Court of Civil Appeals of Texas. Amarillo.

Jan. 26, 1953.

Rehearing Denied Feb. 9, 1953.

Lewis Jeffrey, Amarillo, for appellant.

Ratliff, Conner & Walker, Spur; L. A. Wicks, Sr., Ralls, for appellees.

PITTS, Chief Justice.

This is a suit for personal and property damages growing out of a collision that occurred between a motor vehicle and a moving passenger train at the intersection of the paved farm-to-market road number 400 with Panhandle and Santa Fe single line track railway in Lubbock County, Texas, about 1¼ miles west and a little north of Slaton soon after dark at 7:14 p. m. o'clock on October 12, 1951. J. B. Karr, a tenant farmer of Dickens County, filed this suit for himself and as next friend of four of his minor children therein named seeking such damages against appellant, Panhandle and Sante Fe Railway Company. Plaintiffs as appellees herein alleged in part that the railroad crossing at the said intersection was an extra hazardous crossing, more than ordinarily dangerous to nighttime travelers and that it is so peculiarly dangerous that prudent persons travelling over the said road at the said intersection at nighttime cannot use the same with safety unless extraordinary means are there provided to protect such travelers. Appellees further pleaded that the foregoing alleged facts were known to appellant or, in the exercise of ordinary care should have been known to it, and they alleged negligence on the part of appellant because of its failure to provide the required extraordinary means at the said crossing. Appellant answered by joining issues with appellees on the matters pleaded by them and alleged negligence of the occupants of the said motor vehicle and contributory negligence and negligence as a matter of law on the part of J. B. Karr, the operator of the motor vehicle.

The case was tried before a jury and judgment was rendered for appellees upon the jury verdict awarding to J. B. Karr the sum of $6,000 because of injuries sustained by his wife, Inez Karr, $500 because of his own injuries sustained and $100 was awarded to each of the four minor children because of the injuries they each sustained. It was agreed by stipulation that the damage done to the 1947 four door Chevrolet sedan involved in the collision and owned by J. B. Karr was $885, for which sum judgment was also awarded. Appellant perfected its appeal from the judgment and has presented ten points of error.

The jury verdict and the trial court's judgment thereon awarding damages against appellant were based principally upon the alleged negligence of appellant's failure to provide extraordinary means for the protection of nighttime travelers at the alleged extra hazardous railroad crossing. However the jury also found that the crossing in question was an extra hazardous one. Appellant has challenged the sufficiency of the evidence to support such a charge presented by the pleadings of appellees, such issues of fact found by the jury and such a judgment based thereon by the trial court.

It is common knowledge and has been many times judicially recognized that every railroad crossing in use is a place of danger. Yet the common law and statutory duty of a railroad in Texas with respect to an ordinary crossing is no greater than to provide and maintain thereat one crossing sign or signal of the type prescribed by statute, Vernon's Ann.Civ.St. Article 6370, which kind of sign was conclusively proven to be present at the crossing in question and at the time in question. A railroad crossing is not extra hazardous unless it is so unusually and peculiarly dangerous that

prudent persons, in the exercise of ordinary care, could not use it with safety without extraordinary means, over and above the usual sign or signal, having been there provided to warn the approaching travelers and protect them from danger. By an unbroken line of authorities the rule has been well established in Texas that a railroad is under no obligation to provide extraordinary means to warn persons approaching its crossings or intersections with public roads and highways unless the said crossing or intersection is more than ordinarily hazardous. St. Louis Southwestern Ry. Co. of Texas v. Barr, Tex.Civ.App., 148 S.W.2d 924; Lundberg v. Missouri-Kansas-Texas R. Co. of Texas, Tex.Civ.App., 232 S.W.2d 879; Thompson v. St. Louis Southwestern Ry. Co. of Texas, Tex.Civ.App., 55 S.W.2d 1084; Robinson v. Houston Belt & Terminal Ry. Co., Tex.Civ.App., 23 S.W.2d 894; Missouri, K. & T. Ry. Co. of Texas v. Magee, 92 Tex. 616, 50 S.W. 1013.

Before any higher duty attaches on the part of the railroad, the burden is upon him who complains to establish by competent evidence that the railroad crossing is attended by such unusual or extraordinary dangers as to make its use hazardous to a prudent person in the exercise of ordinary care unless extra precautions, more than the usual crossing sign, are provided for his safety. Before a jury is warranted in finding that a railroad is negligent in its failure to provide extraordinary means to warn the travelers over one of its crossings, it must first be established by competent evidence that such a crossing is more than ordinarily hazardous by an obstruction of some sort or by the configuration of the land about it, or that the crossing is a much travelled one so that the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of confusion incident to a busy railroad area, or by some other such causes that would prevent a reasonably prudent person in the exercise of ordinary care from using the crossing with safety. Texas & N. O. R. Co. v. Beard, Tex.Civ. App., 91 S.W.2d 1080, writ refused.

The record before us reveals that the controlling facts with reference to the alleged extra hazardous crossing being here considered are not materially controverted. The railroad crossing in question is situated in the country at a place where the land is comparatively level and there is nothing in the immediate area to obstruct the view of the railroad bed and track at the crossing. The railroad right of way is 100 feet wide and the bed and track are level with the surface of the land at the intersection and the same is elevated a little above the surface in some places immediately west of the crossing. The paved road runs north and south while the railroad runs generally east and west but varies a little making it run slightly southeast and northwest. Parallel with the railroad and 100 feet south of it is the Lubbock-Slaton highway, which is a paved State and Federal Highway carrying much more traffic than the farm-to-market road number 400. The said farm-to-market road intersects the Lubbock-Slaton highway only 100 feet south of the point of its intersection with the railroad. The railroad track is elevated a little above the Lubbock-Slaton highway for some distance west of the crossing in question. The farm-to-market road crosses the Lubbock-Slaton highway after crossing the railroad but it jogs to the west a little at the intersection with the said highway before it continues south. Appellees approached the intersection from the north, travelling on the paved farm-to-market road, which is substantially straight for some distance north of the intersection. The said paved road does not cross the railroad at right angles but it approaches the track at an angle of 63° between its west edge and the railroad on appellees' right as they approach the intersection. However, 111 feet north of the intersection the said road makes a slight curve leaving a 55° angle between it and the railroad for some distance. J. B. Karr, while operating his automobile, had been following another automobile operated by witness Joe Long for several miles, both of them driving at a rate of 40 to 50 miles per hour. The sky was clear on the occasion and the weather was calm except possibly for some wind blowing from the south. Karr and Long, both of whom lived at Spur, Texas, were taking their families to Slaton to see

a high school boys' football game to be played between Spur and Slaton. The night was dark and Karr had driven for some time with his lights dim to prevent them from blinding Long. As both automobiles approached the intersection they slowed down to 12 or 15 miles per hour. At the same time appellant's 15-car passenger train, with every car well lighted and two headlights shining, visible for more than a mile from the crossing down a single track line, was approaching the intersection at a high rate of speed from the west and at a distance of approximately 1355 feet away with its automatic bell ringing continuously and the whistle blowing almost constant blasts from the whistle board at 1355 feet away to the crossing. The train had a regular stationary headlight about 12 feet high and also what is known as a "gyro" light on the front of the train moving back and forth, throwing its light from the ground on one side, then overhead forming an arc or a bow-shape in the sky and then throwing its light to the ground on the other side, then often repeating the same movement, back and forth, giving light for several hundred feet in front of the train and for some distance on each side of it. Others in that vicinity saw the train lights and heard its other signals. The headlights of the approaching train were visible to a traveler on the farm-to-market road for a distance of one-half mile north of the railroad crossing while the train was a mile or more west of the crossing, yet could be distinctly seen all along the line to the crossing. Long, operator of the automobile in the lead, heard the signals immediately before reaching the crossing and safely crossed over it, while the train was estimated to be from 300 feet to 800 feet away. Karr, while driving 50 to 65 feet behind Long at a rate of eight to twelve miles per hour with his lights dim thus approached the crossing when his wife suddenly said in substance: "There is a train coming". When Karr heard the remark of his wife, he suddenly stopped his automobile with the front end of it on the track in front of the approaching train. The train operators saw Long's automobile cross ahead of the train and saw Karr's automobile approaching and assumed he would stop for the crossing. Nevertheless, when they saw Karr's situation, they exercised all possible means to prevent a collision but it was inevitable. The motor of Karr's automobile and that part of the same in front of the windshield was demolished, leaving the body of the automobile back of the windshield intact. Karr and all of his family except his wife remained in that part of the body of his automobile left unharmed and were each only slightly injured. Karr's wife, Inez Karr, a large woman, was the only one thrown from the automobile as a result of the collision. She was more seriously injured than the others but she was not thrown in the path of the train. Karr was 42 years old, his wife 40 and the four children ranged in age from 5 years to 16 years. At the time of the collision, Karr, his wife and the youngest child were riding in the front seat of the automobile with the child in the middle and the other three children were in the back seat.

At the time of the collision the standard cross-buck sign, painted white with black letters as a warning signal, stood more than ten feet high on the south side of the track west of the farm-to-market road but near both and the same was clearly visible for some distance both day and night to travelers approaching the intersection from the north, as appellees were, whether motorists were driving with their lights dim or on high. There were telegraph and power line poles along the railroad, some of them near the paved road, indicating to the average person that there was a railroad near. A telephone booth, indicting as much, was located on the railroad right of way 225 feet east of the intersection and plainly visible. The nearest physical obstruction of any kind or character north of the intersection was a farmhouse 89 feet west of the paved road with some trees and other buildings around it but by actual measurement the nearest building connected with the farmhouse was 623 feet north of the crossing. Between the house and the railroad, including

the crossing, there was a cotton field and nothing else but level open country. There was more than ordinary traffic on the Lubbock-Slaton highway that night and Karr and family were observing the motor lights of travelers on that highway but there were no motorists, other than Karr and Long, on the farm-to-market road in the immediate vicinity of the intersection at the time of the collision. There were two motorists, a truck in front and an automobile following it, on the farm-to-market road, moving north approaching the Lubbock-Slaton highway and the railroad crossing slightly facing Karr. They were across both the railroad and highway from Karr, beyond the jog in the said road, more than 200 feet away and the truck driver was operating with his lights dim while the motorist behind the truck was driving with his lights on high. Because of the jog in the road and the angle of Karr's part of the road, these motorists could not have been directly facing Karr. Karr was driving with all of his windows closed except that the front window on the driver's side was open about three inches. Karr testified that there was a strong wind blowing from the south that night which caused some rattling of his windows. His witness, Long, testified however that the weather was pleasant with little wind and visibility was good. Long's testimony concerning these matters was corroborated by several other witnesses. Karr further testified that as they approached the railroad crossing he was looking directly ahead of him, mostly at the automobile just ahead of him, and was "watching the road, more or less". As they approached the crossing the Karr family were talking about the ordinary things of interest, but one thing in particular they were discussing was the fact that an older son would soon be coming home on a furlough. Nothing was happening that could have been causing any great confusion or that would have prevented an ordinary prudent person, in the exercise of ordinary care, from hearing the train signals and seeing the lights in time to have prevented the collision. In so far as was known, according to the evidence, there had been no prior or subsequent collisions at that railroad crossing.

It is our opinion that a careful examination of these material facts and a fair inference drawn therefrom does not warrant a finding and conclusion to the effect that the railroad crossing in question was an extra hazardous one, which required extraordinary means for the protection of travelers. In addition to the authorities previously cited we also cite St. Louis Southwestern Ry. Co. of Texas v. Hill, Tex.Civ.App., 13 S.W.2d 420; Texas & N. O. R. Co. v. McMahan, Tex.Civ.App., 144 S.W.2d 1019, affirmed 138 Tex. 626, 161 S.W.2d 70; Texas & N. O. R. Co. v. Compton, 135 Tex. 7, 136 S.W.2d 1113; Walker v. Texas & N. O. R. Co., Tex.Civ.App., 150 S.W.2d 853; Galveston, H. & S. A. Ry. Co. v. Burr, Tex.Civ.App., 291 S.W. 299; Louisiana Ry. & Nav. Co. of Texas v. Loudermilk, Tex.Civ.App., 295 S.W. 193; Galveston-Houston Electric Ry. Co. v. Patella, Tex.Civ.App., 222 S.W. 615.

We are aware of the fact that Karr and his family had never been over the road in question before, that the railroad intersection was new to them and that none of them knew a train was near until Mrs. Karr announced a train was approaching. However, Karr testified that he could see distinctly as he approached the railroad crossing and the undisputed evidence reveals there was nothing to obstruct his view or prevent him from seeing the railroad, the cross-buck sign, and certainly the approaching well lighted train with all of its signals being effectively used for his benefit, if he had been exercising the ordinary care required of him on such an occasion. It is our opinion that ordinary prudent people, in the exercise of ordinary care, even though they were strangers to the road and the crossing, would not have pulled upon the track and stopped under the existing circumstances here revealed but would have been alert enough to have discovered the approaching train in time to have avoided the collision. Strangers to a public road and to such railroad crossings are required to keep a

proper lookout, such as ordinary prudent people, in the exercise of ordinary care, would keep under the same or similar circumstances. We think our position in these matters is well supported by the authorities cited and numerous others. If we are correct, appellant was not negligent, as a matter of law and under the facts presented, in its failure to provide extraordinary means for the protection of travelers at the crossing in question, and it is not therefore liable to appellees for damages.

But, be that as it may, appellant further contends that J. B. Karr was guilty of contributory negligence as a matter of law and that such was the sole proximate cause of the injuries sustained by him and the members of his family and the damages resulting therefrom. Where no statutory violation was involved, it has been held that:

"Where the undisputed evidence shows the existence of a danger and that the plaintiff, or injured party had knowledge or was chargeable with knowledge of the danger and exercised no care whatever, then there is shown a case of contributory negligence as a matter of law."

Cisco & N. E. Ry. Co. v. McCharen, Tex. Civ.App., 118 S.W.2d 844, 847, and numerous authorities there cited in support of the rule. We think the facts previously recited herein conclusively show that J. B. Karr was guilty of contributory negligence as a matter of law under the rule of law just cited. Since he was chargeable with knowledge of the existing danger as a reasonably prudent person in the exercise of ordinary care, it is our opinion that the undisputed evidence shows the existence of danger and that Karr was chargeable with knowledge of such danger, yet the evidence conclusively shows that Karr exercised no care whatever.

On the occasion in question, when Karr was only a short distance from the railroad crossing, a swift moving train was approaching on a dark night within 1500 feet of the crossing and with its many lights shining brightly, its bell ringing and its whistle blowing so as to be audible at the crossing, according to the uncontroverted evidence. The evidence also conclusively reveals that the near approach of the speeding train at such a distance and under such circumstances created an immediate hazard at the crossing as Karr approached the tracks, notwithstanding the finding of the jury to the contrary. There was absolutely no evidence of probative force to support the jury's negative answer to that issue (Special Issue No. 32). With that approaching train plainly visible and sufficiently close that it hit Karr's motor vehicle almost the very instant he stopped on the track, Karr violated the following provisions of Article 6701d, Section 86, Subsections (c) and (d), which reads as follows:

"Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall not proceed until he can do so safely when:

\* \* \* \* \* \* . .

"(c) A railroad engine approaching within approximately fifteen hundred (1500) feet of the highway crossing emits a signal audible from such distance and such engine by reason of its speed or nearness to such crossing is an immediate hazard;

"(d) An approaching train is plainly visible and is in hazardous proximity to such crossing."

Section 143 of the same Article makes such violation a misdemeanor offense punishable by a fine of not more than $200. It is admitted by all parties that Karr did not stop within fifty feet of the railroad track and not less than fifteen feet from it. His failure to so stop was in direct violation of the statute just previously cited. For this reason Karr was guilty of negligence which proximately caused the collision and injuries as a matter of law, notwithstanding the finding of the jury to the contrary wherein it found that the approaching train was not plainly visible, that Karr failed to

stop within fifty feet and not less than fifteen feet from the track but such failure was not a proximate cause of the collision and injuries sustained. (Special Issues Nos. 33, 34 and 35). The evidence conclusively supports the jury finding that Karr failed to stop within fifty feet and not less than fifteen feet from the track (Issue 34). But the overwhelming weight of the evidence conclusively refutes the finding of the jury to the other two issues (Issues 33 and 35). It has been held as a matter of law under such circumstances that:

"* * * appellant's failure to stop not less than 15 feet from the nearest rail of the track being used by the engine and his failure to wait until he could safely proceed was a proximate cause of the collision and its consequences."

Lackey v. Gulf, C. & S. F. Ry. Co., Tex. Civ.App., 225 S.W.2d 630, 632. In addition to other authorities previously cited, our position in this matter is also supported by the cases of Texas & N. O. R. Co. v. Stewart, Tex.Civ.App., 248 S.W.2d 177, writ refused, n. r. e., and Zamora v. Thompson, Tex.Civ.App., 250 S.W.2d 626, writ refused. The Lackey case makes a further statement that is applicable to the facts here presented in the following language:

"We know as a matter of common knowledge that a railway engine is not easily hid or obscured, and that had appellant looked he must have seen the engine."

In the instant case Karr could have seen the approaching train any time several hundred feet from the crossing by a mere slight turn of his vision to the right. It has been held that an injured party is not entitled to recover for his injuries if his own negligence contributed to such injuries. McFall v. Fletcher, 138 Tex. 93, 157 S.W. 2d 131.

The collision and injuries to Karr's minor children so immediately followed directly upon Karr's negligence in violating the statute in question, that, under the circumstances then existing, there was not any other intervening or contributing cause. Under the authorities previously cited and

many others, Karr's negligence in violating the statute was the sole proximate cause of the collision which resulted in the injuries, thus barring recovery for damages to the minor children also.

Except for the matters previously herein disposed of by us contrary to appellees' contentions, the jury acquitted appellant of any other alleged negligence when it found that the speed of appellant's train at the time and place in question was not negligence and that the crossing signals were properly given. Appellees assumed the burden of proving that their injuries and damages were sustained as a result of the negligence of appellant. It is our opinion that appellees have failed to discharge that burden and are not therefore entitled to recover.

We also sustain appellant's fourth point concerning its alternative motion to the effect that the trial court should have disregarded certain specified answers of the jury on the grounds that they were unsupported by the evidence and have rendered judgment for appellant upon other specified answers of the jury favorable to the appellant and well supported by the evidence. In fact, we have already hereinabove passed on all of the said issues in question and, in effect, have already sustained appellant's fourth point concerning its alternative motion. In the said motion appellant seeks to have the jury's answers concerning an extra hazardous crossing and providing extraordinary means therefor and the answers to Issues Numbers 32, 33 and 35 set aside and disregarded. We have already held that such answers are not supported by the the evidence. Such therefore have no force and effect and should be set aside. The jury also found that the rate of speed of appellant's train as it approached the crossing was not negligence; that the train gave the proper signals as it approached the crossing and such findings are supported by the evidence. The jury further found that J. B. Karr failed to stop within fifty feet of the crossing and this finding is conclusively supported by the evidence, thus making J. B. Karr guilty of negligence per se which proximately caused the collision.

Appellant's fourth point concerning the said motion is therefore sustained.

For the reasons stated it is our opinion that the judgment of the trial court should be reversed and judgment should be here rendered denying appellees any recovery and it is so ordered. Reversed and rendered.